IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NANCY R. SHOPE, | ) | CASE NO.  1:16-cv-01842 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Nancy R. Shope ("Plaintiff" or "Shope") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

Shope protectively filed[1] an application for Disability Insurance Benefits ("DIB") on

March 4, 2013.  Tr.  14, 87, 156-162, 172.   Shope alleged a disability onset date of March 3,

2013.  Tr. 14, 87, 156, 172.  She alleged disability due to mixed connective tissue disease, lupus,

Raynaud's disease, rheumatoid arthritis, fibromyalgia, arthritis, and depression.  Tr. 87, 99-100,

101, 110, 117, 181.  Shope's application was denied initially (Tr. 110-113) and upon

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/10/2017).

reconsideration by the state agency (Tr. 117-120). Thereafter, she requested an administrative hearing. Tr. 121-122.

On February 13, 2015, an administrative hearing was conducted by Administrative Law Judge Mary Lohr ("ALJ"). Tr. 34-86. On March 27, 2015, the ALJ issued her decision. Tr. 11-33. In her decision, the ALJ determined that Shope had not been under a disability within the meaning of the Social Security Act from March 3, 2013, through the date of the decision. Tr. 14, 30. Shope requested review of the ALJ's decision by the Appeals Council. Tr. 9-10. On May 27, 2016, the Appeals Council denied Shope's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5.

## II. Evidence

### A. Personal, vocational and educational evidence

Shope was born in 1968 and was 46 years old at the time of the hearing. Tr. 42, 156. Shope lived with her husband, 16 year-old son, and sister in a house that was all one floor. Tr. 43. She graduated from high school. Tr. 44. For 20 years and 8 months, Shope worked as a bartender and cleaner at an American Legion Post. Tr. 44-45.

### B. Medical evidence[2]

#### 1. Treatment history

On March 30, 2012, Shope saw Dr. Marina N. Magrey, a rheumatologist at Metro Medical Center ("Metro"), for a consultation regarding joint pain, stiffness, and low back pain. Tr. 374-377. Shope relayed that in 1994 she had developed a rash and was advised she had discoid lupus. Tr. 374. She was treated with Plaquenil and her rash cleared. Tr. 674. Shope indicated that she started having pain in her joints around 2010. Tr. 374. She was having

---

[2] Since Shope's arguments pertain to her physical as opposed to her mental impairment claims, the medical evidence summary is generally limited to Shope's physical impairments.

morning stiffness lasting for an hour as well as stiffness with prolonged sitting. Tr. 374. She

had no joint swelling but pain in her knees, elbows and hands. Tr. 374. She was also having low

back pain that was worse in the morning but better with activity. Tr. 374. Shope was positive

for Raynaud's.[3] Tr. 376. On examination, Dr. Magrey observed no swelling but she noted

possible inflammatory arthritis. Tr. 377. Dr. Magrey prescribed Plaquenil. Tr. 377. During a

subsequent visit with Dr. Magrey on June 28, 2012, Shope reported similar complaints of pain

and stiffness. Tr. 358-361. She had no problems with overhead elevation or shampooing her

hair but sometimes she had problems getting out of chairs. Tr. 358-359. Dr. Magrey's

impression was "arthralgia, myalgia, rash, and Raynaud's. She is RNP[4] positive. Most likely

has MCTD [Mixed Connective Tissue Disorder][5]. Has noticed no improvement with

Plaquenil. She is taking Neurontin 300 mg at bedtime with no improvement in sleep. She takes

Celexa." Tr. 361. Dr. Magrey switched Shope to Cymbalta and increased her Neurontin. Tr.

361.

On August 1, 2012, Shope was seen in the emergency room at Mercy Allen Hospital for

low back pain that was radiating. Tr. 612-629. Shope was discharged the same day with

---

[3] Raynaud's phenomenon is "intermittent bilateral ischemia of the fingers, toes, and sometimes ears and nose, with severe pallor often paresthesias and pain, usually brought on by cold and emotional stimuli and relieved by heat; it is usually due to an underlying disease or anatomical abnormality." *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1430.

[4] "The RNP blood test is used to detect antibodies that are created when the signs or symptoms of connective tissue diseases are present. Called Mixed Connective Tissue Disease [MCTD], it's actually several diseases that target the tissues which support the different components of the body. This could be the blood, fat tissues, bone, or even cartilage. Because it is typically an immune system issue, the RNP antibodies indicate the presence of at least one of these diseases." http://healthresearchfunding.org/rnp-blood-test-results-explained/ (last visited 7/10/2017).

[5] "Mixed connective tissue disease has signs and symptoms of a combination of disorders — primarily lupus, scleroderma and polymyositis. For this reason, mixed connective tissue disease is sometimes referred to as an overlap disease." http://www.mayoclinic.org/diseases-conditions/mixed-connective-tissue-disease/basics/definition/con-20026515 (last visited 7/10/2017).

diagnoses of sprained back and fibromyalgia and prescribed Flexeril, Vicodin, and Prednisone. Tr. 622-629.

Upon Dr. Magrey's referral, on August 21, 2012, Shope saw neurologist Dr. Marc D. Winkelman, M.D. Tr. 334-340. Shope's chief complaint was with her hands and feet. Tr. 334. She relayed that the problems with her feet started about two years earlier with a tingling and burning sensation in the top of her toes and then spread to the entire sole. Tr. 335. She did not have weakness in her feet. Tr. 335. She reported having Raynaud's phenomenon in her hands for years. Tr. 335. Shope's fingers tingled but only when using her hands to write or perform repetitive tasks. Tr. 335. At times, the tingling went all the way to her right shoulder. Tr. 335. Also, her hands felt numb in the morning when waking up. Tr. 335. Shope also indicated that she had low back pain. Tr. 335. On examination, Shope exhibited some reduced sensation to light touch and pinprick in her soles. Tr. 337. Dr. Winkelman ordered an EMG of Shope's right limbs and testing of Shope's B12 level. Tr. 338. During a subsequent visit with Dr. Winkelman on October 23, 2012 (Tr. 307-310), a physical examination revealed reduced sensation to pinprick and cold in Shope's hands and feet (Tr. 309). Shope's B12 and EMG testing of her arm and leg were negative. Tr. 310. The September 25, 2012, EMG showed no evidence of bilateral carpal tunnel syndrome or right cervical radiculopathy; no evidence of right lumbosacral radiculopathy or peripheral neuropathy in bilateral extremities; and no evidence of peripheral neuropathy. Tr. 702. Dr. Winkelman concluded that Shope's reported "burning" and loss of pain and temperature sensation on examination were suggestive of small-fiber polyneuropathy. Tr. 310.

Shope continued to see Dr. Magrey in 2012 and 2013. Tr. 245-250, 280-285, 313-317, 473-478. During an October 8, 2012, appointment, Shope complained of pain in both hands and

morning stiffness lasting about an hour. Tr. 313. Shope also reported numbness in both hands. Tr. 313. Dr. Magrey noted that an EMG had been performed which revealed no carpal tunnel syndrome or radiculopathy. Tr. 313. Shope reported that she was unable to cope at work. Tr. 314. Dr. Magrey's impression was MCTD with inflammatory arthritis. Tr. 316. Dr. Magrey started Shope on Methotrexate and Folic acid. Tr. 316. Also, Dr. Magrey advised Shope to use Prednisone and to continue with Plaquenil. Tr. 316. Dr. Magrey also referred Shope to podiatry for plantar fasciitis and continued Shope on Neurontin for fibromyalgia. Tr. 316. Dr. Magrey noted that Shope needed to exercise. Tr. 316. In February 2013, Dr. Magrey indicated that Shope's arthritis was in remission. Tr. 250. However, she was having pain in her heels and was scheduled to see Dr. Bodman. Tr. 250. Due to fibromyalgia, Shope was not sleeping well. Tr. 250. Dr. Magrey increased Shope's Neurontin. Tr. 250.

On April 19, 2013, Shope saw podiatrist Michael J. Bodman, DPM, at Metro with complaints of multiple foot concerns, nerve pain, heel pain and toe pain. Tr. 492-495. Shope reported that her problems had been present for months. Tr. 492. On examination, Dr. Bodman observed diminished sharp/dull, vibratory, and epicrit[6] sensation. Tr. 493. Muscle strength was within normal limits and there were no range of motion limitations. Tr. 494. Dr. Bodman assessed "PN, FM, [and] IPK[.]"[7] Tr. 494. Dr. Bodman noted that Shope was using a cane for stabilization. Tr. 494.

---

[6] Epicritic is defined as "relating to or serving the purpose of accurate determination; applied to cutaneous nerve fibers that serve the purpose of perceiving fine variations of touch or temperature." *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 631.

[7] PN is believed to stand for peripheral neuropathy; FM is believed to stand for fibromyalgia and IPK is believed to stand for intractable plantar keratosis. "Intractable plantar keratosis (IPK) is a focused, painful lesion that commonly takes the form of a discrete, focused callus, usually about 1 cm, on the plantar aspect of the forefoot." http://emedicine.medscape.com/article/1233309-overview (last visited 7/10/2017).

Also, on April 19, 2013, Shope was seen at the Metro emergency room with complaints of back pain. Tr. 484-489. Shope was neurologically intact with no radicular pain. Tr. 486. She received Toradol in the emergency room and was discharged home in stable condition. Tr. 486.

A few days later, on April 22, 2013, Shope saw Dr. Magrey for follow up regarding her MCTD. Tr. 473-478. Shope reported pain in her back and burning pain in her feet. Tr. 474. Shope had been using a cane because her right knee was giving out. Tr. 474. She had morning stiffness lasting an hour and a half. Tr. 474. She was taking Methotrexate pills. Tr. 474. Dr. Magrey observed no joint swelling on examination. Tr. 478. Dr. Magrey continued Shope on Methotrexate and Plaquenil, increased Shope's Neurontin for fibromyalgia, and ordered a lumbar spine x-ray due to Shope's reported pain in the back and feet. Tr. 478. The April 22, 2013, lumbar spine x-ray showed degenerative disc disease at the L2-L3 level. Tr. 482.

During a May 20, 2013, visit with Dr. Winkelman, Shope complained of pain in her limbs. Tr. 468-470. Dr. Winkelman's examination revealed reduced sensation below Shope's mid-legs. Tr. 470. Otherwise, sensation was okay. Tr. 470. Dr. Winkelman indicated that Shope's gait was "slow, painful but tandem ok." Tr. 470. Dr. Winkelman's impressions were "suspect small-fiber polyneuropathy" and "sensory exam better in [upper extremities] but worse in [lower extremities]--no net change--[patient] seems stable since last fall[.]" Tr. 470.

During a July 8, 2013, visit with Dr. Magrey (Tr. 458-463), Shope reported morning stiffness that lasted about two hours (Tr. 458). She had no joint swelling. Tr. 458. She was continuing to take Methotrexate, Plaquenil, and Neurontin. Tr. 458. Shope reported, however, that the Neurontin was not helping with her pain. Tr. 458. Shope's arthritis remained in remission. Tr. 463. Dr. Magrey continued Shope's medications and advised Shope to follow up

with neurology regarding the numbness in her hands and feet. Tr. 463. Shope saw Dr. Bodman on July 26, 2013. Tr. 446-448. Dr. Bodman's assessment in July (Tr. 448) remained unchanged from his April 2013 assessment (Tr. 494).

On August 2, 2013, Shope sought treatment at the Metro emergency room for severe low back pain that was radiating to the left leg and for left groin pain. Tr. 504-517. Shope reported that the radiating pain had started three days earlier. Tr. 506. Shope's discomfort was worse with movement and lessened when standing. Tr. 506. Shope indicated that she normally took Ibuprofen for her discomfort but she had not taken any that day. Tr. 506. Shope used a cane to ambulate. Tr. 506. Aside from paralumbar tenderness, physical examination findings were normal. Tr. 507. Shope was diagnosed with back pain/sciatica. Tr. 508. For her discomfort, Shope was treated with Percocet and Prednisone. Tr. 507. She was discharged in stable condition. Tr. 508.

Upon Dr. Magrey's referral, on August 16, 2013, Shope saw Dr. Murray A. Greenwood. M.D., of the Physical Medicine and Rehabilitation Clinic at Metro with chief complaints of low back pain and knee pain. Tr. 701-708. Shope reported her back pain had been ongoing for several years. Tr. 701. She indicated her back pain was constant but fluctuated in intensity, with estimated flare ups 2-3 times per month. Tr. 701. Shope's knee pain was worse when ambulating up and down stairs and with prolonged sitting. Tr. 701. Shope also noted numbness and tingling in her hands and feet. Tr. 701. Shope had not tried physical therapy for her back or knees and she had not had injections. Tr. 702. She had tried Cymbalta for her pain but indicated it "made her feel funny." Tr. 702. She tried Mobic but was not sure it was helping. Tr. 702. She was taking Neurontin and tolerating it well. Tr. 702. Dr. Greenwood reviewed Shope's past diagnostic studies, including the April 2013 lumbar spine x-ray, September 2012 EMG study and

an April 2012 knee x-ray, showing no evidence of acute fracture or dislocation and no significant degenerative changes or soft tissue abnormalities. Tr. 702. Dr. Greenwood's examination showed normal strength, sensation and reflexes in the lower extremities. Tr. 704. There was tenderness to palpation in the lower extremities and, also, tenderness at the cervical paraspinals and traps and at the lumbosacral spinal muscles bilaterally. Tr. 704. Dr. Greenwood observed no evidence of spasm or trigger points. Tr. 704. Straight leg raise caused some shooting pain up Shope's right leg. Tr. 704. Dr. Greenwood noted that Shope ambulated with a cane. Tr. 704. Dr. Greenwood concluded that Shope's "clinical presentation and examination was consistent with back pain with underlying DDD and features of myofascial pain." Tr. 704. Dr. Greenwood also indicated that, considering Shope's "history and normal imaging, [her] knee pain [was] likely secondary to patellofemoral syndrome." Tr. 704. Dr. Greenwood made some changes to Shope's medications, recommended physical therapy for core strengthening and quad strengthening, and he encouraged weight loss. Tr. 704.

Shope followed up with Dr. Winkelman on September 27, 2013. Tr. 525-529. Shope reported that she was "not great" since her last visit. Tr. 525. She was continuing to have tingling in her hands and feet that was painful at times with repetitive movement but there was no burning sensation. Tr. 525. Her right leg was giving out. Tr. 525. She saw her gynecologist regarding bladder issues and was informed it was "neurologic." Tr. 525. On examination, Dr. Winkelman observed reduced sensation to pinprick and cold in Shope's hands and feet. Tr. 527. Shope's gait was slow and she used a cane but tandem walk was okay. Tr. 527. Dr. Winkelman's impression was "suspect small-fiber polyneuropathy causing pain & bladder dysfunction; possible that lesion is in cervical cord affecting spinothalamic tracts and descending pathways to bladder, since [EMG] is neg[ative], need to r/o that." Tr. 527. Dr. Winkelman

added Desipramine to be taken at bedtime for pain. Tr. 527. Dr. Winkelman ordered an MRI of the spine. Tr. 527. The MRI was taken on October 5, 2013, and showed "Mild cervical spondylosis at C4-C5 and toward the left foramina at C5-C6." Tr. 530.

On October 21, 2013, Shope saw Dr. Magrey. Tr. 534-544. Shope complained of morning stiffness which was lasting all day. Tr. 535. Shope complained of diffuse pain and aching all over. Tr. 535. She was continuing to have right knee pain, with her right knee giving out and clicking in her knee when she walked. Tr. 535. Shope had no joint swelling. Tr. 535. Dr. Magrey continued to assess MCTD with inflammatory arthritis. Tr. 539. Dr. Magrey increased Shope's Methotrexate and continued the Plaquenil. Tr. 539. For Shope's numbness in her hands and feet with small-fiber neuropathy and fibromyalgia, Dr. Magrey continued Neurontin. Tr. 539.

On November 15, 2013, Shope saw Dr. Bodman for a painful callous on her left foot. Tr. 545-547. On examination, Dr. Bodman observed diminished sharp/dull, vibratory, and epicrit sensation. Tr. 493. Dr. Bodman assessed nerve pain, neuropathy, and neuritis. Tr. 547.

Throughout 2014, Shope continued to see Dr. Magrey (Tr. 550-556, 562-567, 638-650, 657-667), Dr. Winkelman (Tr. 631-637), and Dr. Bodman (Tr. 570-574, 651-656).

At a January 2014 visit with Dr. Magrey, Shope complained of worsening symptoms relating to her neuropathy. Tr. 550. Shope reported intermittent swelling in her knee, pain in her hands with rapid repetitive movements, dry eyes or mouth, and morning stiffness lasting two hours. Tr. 550. Dr. Magrey administered corticosteroid injections in both knees. Tr. 555. During an April 2014 visit with Dr. Magrey, Shope complained of pain in her right shoulder for about a month and she indicated that overhead elevation hurt her. Tr. 562. She also continued to have pain in her hands and feet. Tr. 562. Dr. Magrey assessed rotator cuff tendonitis and

administered a corticosteroid in Shope's right shoulder. Tr. 567. In August 2014, Shope saw Dr. Magrey and reported three weeks relief following her shoulder and knee injections. Tr. 638-639. Shope had pain in her right shoulder, right knee, hands, feet and lower back and she indicated her pain was constant and causing her to wake up every two hours at night. Tr. 638-639. Dr. Magrey's impression was MCTD with inflammatory arthritis, stable; small-fiber neuropathy; and right shoulder rotator cuff tendonitis. Tr. 644-645. Shope saw Dr. Magrey on November 25, 2014, with reports of persistent pain in her heels. Tr. 658. Shope was provided orthotics. Tr. 658. She was continuing to have morning stiffness for a few hours, right knee problems and reported severe pain in her feet. Tr. 658. Shope reported she had applied for SSI and Dr. Magrey indicated that Shope would be referred to Physical Medicine and Rehabilitation for a disability evaluation. Tr. 662.

During an August 20, 2014, visit with Dr. Winkelman, Shope reported new symptoms that she had been having for about six months. Tr. 631. More particularly, Shope reported that her hands hurt more when she was driving, writing and holding a cane and she had to shake her hands for relief. Tr. 631. Dr. Winkelman continued to diagnose small-fiber polyneuropathy, noting it was likely related to Shope's MCTD. Tr. 633. Dr. Winkelman also indicated that Shope's new hand symptoms suggested carpal tunnel syndrome and he recommended an EMG and splints. Tr. 633. Shope declined both recommendations. Tr. 633. Dr. Winkleman increased Shope's Desipramine dosage because the previous dosage was not helping. Tr. 631, 633.

During her November 2014 visit with Dr. Bodman, Shope was diagnosed with insertional achilles tendonitis. Tr. 653. Dr. Bodman's recommendations included anti-inflammatories, RICE (rest, ice, compression and elevation), and a heel lift. Tr. 653.

On December 1, 2014, Shope saw Dr. Shu Qua Huang of the Physical Medicine and Rehabilitation Clinic at Metro.[8]  Tr. 668-676.  Shope reported that her full body pain had gotten worse since a visit the prior year.  Tr. 668.  Shope indicated that Flexeril helped with her back pain but did not help her sleep because of her full body pain.  Tr. 668.  Shope's low back pain did not radiate.  Tr. 668.  Shope's other medications for pain included Neurontin, Norpramin, Flexeril, Naproxen, and Celexa.[9]  Tr. 668.  Shope also complained of bilateral knee pain, numbness and tingling in all four extremities, right leg weakness and use of a cane.  Tr. 668.  Shope denied bowel or bladder issues.  Tr. 668.  Shope indicated she had not attended physical therapy due to insurance but reported she was doing exercises at home.  Tr. 669.  Dr. Huang reviewed Shope's medical history, noting diagnoses by Shope's doctors and prior diagnostic studies.  Tr. 669-670.  Dr. Huang's physical examination findings included tenderness to palpation diffusely over the midline, paraspinals; back range of motion moderately limited on flexion and extension, noting that Shope slanted her body to reduce right-sided flexion; strength in hips, knees, and ankles was 4/4, with give way weakness noted in all muscles tested; and sensation was altered to light touch in the bilateral extremities and hands.  Tr. 671-672.  Dr. Huang observed that Shope was limping and using a cane in her right hand but noted that Shope reported no new difficulties with gait.  Tr. 669, 672.  Dr. Huang assessed MCTD, fibromyalgia, depression, small-fiber neuropathy, patellofemoral syndrome with bilateral knee pain, and chronic spondylogenic low back pain with radiation down buttocks.  Tr. 672.  He recommended that Shope continue with Celexa, Neurontin, Naproxen, and Flexeril.  Tr. 672.  Dr. Huang

---

[8] Shope's first appointment with Dr. Huang was on October 21, 2013.  Tr. 687-693.  The office notes from the October 21, 2013, visit were presented only to the Appeals Council, not the ALJ.  Tr. 4 (Exhibit 10F); Tr. 33; Tr. 230-231.

[9] Shope was also taking Celexa for depression. Tr. 668.

indicated that there was room for increases in Neurontin but he encouraged physical activity, physical therapy and home exercise program as a primary means of pain control.  Tr. 672.  Dr. Huang noted that Shope wanted to go to physical therapy closer to home.  Tr. 672.  Dr. Huang completed Shope's disability paperwork and recommended follow up in three months.  Tr. 672.

### 2.  Opinion evidence

*Dr. Huang*

On December 4, 2014, Dr. Huang completed a form entitled "Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment."  Tr. 575-576. The form included a definition of "sedentary work" and asked "How many HOURS OF SEDENTARY WORK do you believe your patient could perform each day (5 days per week) on a sustained basis?"  Tr. 575 (emphasis in original).  Dr. Huang indicated that Shope could perform less than 6 hours of sedentary work each day on a sustained basis, adding, as an explanation, Shope "needs frequent position changes[.]"  Tr. 575.  Dr. Huang also opined that Shope had the following functional limitations: stand/walk at one time for 15 minutes or less; sit at one time for 60 minutes; lift and carry 5 pounds or less occasionally; and lift and carry 5 pounds or less frequently.  Tr. 575.  Dr. Huang explained the exertional limitations by noting "hand pain & weakness[.]"  Tr. 575.  Dr. Huang concluded that Shope could only occasionally finger (fine manipulation), handle (seize/hold/grasp/turn with hands), and reach (extending hand and arm in any direction below shoulder level).  Tr. 576.  The noted manipulative limitations were bilateral.  Tr. 576.  Dr. Huang opined that Shope could only stoop occasionally.  Tr. 576. Also, Dr. Huang opined that Shope would likely be absent from work 3 days per month due to pain and arthritis and that pain prevents Shope's ability to concentrate to consistently perform detailed or multi-step task but usually would not prevent performance of at least simple tasks.

Tr. 576.   When asked whether the described limitations had lasted for at least 12 months, Dr. Huang checked the "no" box.  Tr. 576.

*State agency reviewing physicians*

On May 17, 2013, state agency reviewing physician Lynne Torello, M.D., completed a Physical RFC Assessment.  Tr. 91-92.  With respect to exertional limitations, Dr. Torello opined that Shope had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly, other than as indicated for lift and/or carry limitations.  Tr. 91.  With respect to postural limitations, Dr. Torello opined that Shope had the RFC to occasionally climb ramps/stairs, stoop, kneel, crouch and crawl; frequently balance; and never climb ladders/ropes/scaffolds.  Tr. 91-92.  Dr. Torello explained the foregoing postural limitations were due to "Hepatitis, RA, mixed connective tissue disorder[,] GERD, arthritis, fibromyalgia, discoid lupus, endometriosis, ovarian cyst, sinusitis, hypothyroid[.]"  Tr. 92.  Dr. Torello found no manipulative, visual, communicative, or environmental limitations.  Tr. 92.

Upon reconsideration, on August 14, 2013, state agency reviewing physician Eli Perencevich, D.O., completed a Physical RFC Assessment.  Tr. 104-106.  Dr. Perencevich agreed with the limitations as set forth in Dr. Torello's RFC but added environmental limitations of avoidance of concentrated exposure to extreme cold and avoidance of even moderate exposure to hazards (machinery, heights, etc.).  Tr. 106.  Also, Dr. Perencevich explained the exertional limitations stating that a "[lumbar spine] x-ray show[ed] [degenerative disc disease] at L2-3 . . . [t]here [was] paralumbar tenderness.  Normal gait.  No sensory deficits to light touch. [Diagnosed] back pain, sciatica.  [History] of RA, treated – [Methotrexate] etc."  Tr. 105.

## C.    Testimonial evidence

At the start of the February 13, 2015, hearing, Shope's attorney indicated that they had received records from Metro Medical Center but some of the pain management records were not included.  Tr. 37-38, 41-42.  Shope's attorney had made a second request for the pain management records and requested that the record remain open for two weeks to allow Shope time to submit the additional records.  Tr. 37-38.  The ALJ agreed to leave the record open for two weeks for that purpose.  Tr. 38, 85.  Plaintiff's counsel requested two extensions of time.  Tr. 230.  The first request for extension dated March 2, 2015, was granted.  Tr. 230.  The ALJ denied the second requested for extension dated March 12, 2015, and on March 27, 2015, the ALJ issued her decision.  Tr. 11-33, 230.

### 1.    Plaintiff's testimony

Shope was represented and testified at the hearing.  Tr. 42-68, 82-84.  Shope reported recent weight gain, which she attributed to being less active.  Tr. 42-43.  Shope has a driver's license and is able to drive.  Tr. 43.  Shope stopped her bartending work in October 2012 because she had problems standing and performing stocking tasks.  Tr. 45.  Her feet were really bothering her and had to stand on one leg to relieve the pain on the other side.  Tr. 45.   She stopped work completely on March 3, 2013.  Tr. 44-45.  When Shope stopped working she weighed 198 pounds.  Tr. 67.  At the time of the hearing, she weighed 260 pounds.  Tr. 67.

When asked what Shope felt limited her ability to work, she indicated she has difficulty getting ready and moving about in the morning; difficulty walking; and difficulty wearing socks and shoes.  Tr. 46.  She explained that the pressure of socks and shoes makes her pain worse.  Tr.

46-47, 61.  Also, she has to take medicine in the morning and, after she takes it, she feels ill and has to lie back down.  Tr. 47.

Shope has pain in her feet, hands and back.  Tr. 47.  Shope indicated that her doctors have told her that her that her pain is caused by small fiber neuropathy.  Tr. 47.  She has tingling in her feet and hands and, if she holds something for too long (about 10 minutes), she has to place it down because she starts having pain in her hands that goes up her arm.  Tr. 47-48, 64-65.  She is able to pick things up but opening a jar would be difficult for her and her hands start to go numb if she does any type of repetitive motion with her hands or holds things for too long.  Tr. 54-55.  Also, stirring things is difficult for her.  Tr. 54.  Shope indicated that she has also been diagnosed with inflammatory arthritis.  Tr. 48.

Shope was taking Flexeril and Naproxen for pain.  Tr. 48.  She also indicated that, when her back has gone completely out, she has gone to the emergency room and been prescribed Percocet to take until her back is more manageable.  Tr. 48-49.  Additional medications included Neurontin (Gabapentin), Celexa, Trazodone, and Methotrexate.  Tr. 52.  Shope feels that her medication does help but she has some side effects, including dizziness, being off balance, and bowel problems.  Tr. 53.  Also, the Methotrexate, which Shope takes once each week, makes her very tired.  Tr. 53.  She takes the Methotrexate on Wednesday mornings and by Wednesday evening she starts feeling really tired and usually does not start feeling better until Friday.  Tr. 62-63.

Shope uses a cane when she is out and about.  Tr. 60-61. Her foot doctor suggested that she use a cane and Shope feels she needs one because she does not know if her knee is going to give out and because of the pain in her feet, which is worse when she is wearing socks and shoes.  Tr. 60-61.  She does not use her cane all the time when she is in the house because she feels okay

in the house, noting that she can use the walls and furniture.  Tr. 60-61.  Shope does use her cane while she is in her yard at home.  Tr. 61.

Normally, Shope does not like to drive without another person in the car in case she becomes ill.  Tr. 49.  Thus, when physical therapy was recommended, she declined to go because it was a 45 minute drive to attend physical therapy.  Tr. 49.  In lieu of attending physical therapy, Shope was doing some exercises at home.  Tr. 49.  Shope stated that she felt that the home exercises were helping, especially in the morning because it helped make her less stiff.  Tr. 49, 66.  Shope does not wear braces on her hands and no surgery has been recommended.  Tr. 49-50.  Lying down helps Shope with her pain and increased activity makes her pain worse.  Tr. 50.

Shope estimated being able to walk for about 15 minutes before needing to stop and rest.  Tr. 53-54.  She estimated being able to stand up for about 15-20 minutes at a time.  Tr. 54.  Shope can sit for about 30 minutes.  Tr. 55.  When sitting for too long, she starts to feel pain and has to move herself around.  Tr. 55.  Also, standing up for a short time helps with the pain.  Tr. 55.  For example, she explained that she had been moving around in her seat during the hearing because she was feeling some pain.  Tr. 55.  When asked if she needed to stand at that moment during the hearing, Shope indicated she was okay.  Tr. 55.  After traveling to her doctor's office, which is about a 45 minute drive, Shope is stiff and she needs a cane for support to get out of the car.  Tr. 67, 68.  After sitting for about 45 minutes, Shope indicated it takes her about 30 minutes to get back to normal.  Tr. 68.  Shope can bend over but she cannot squat down because, if she squats, she cannot get back up.  Tr. 54.  Shope indicated she can lift 5 pounds.  Tr. 55.

Shope has problems sleeping because of her pain and spasms.  Tr. 57-58, 65.  The spasms are in her calves and she has them about 3-4 times each week.  Tr. 65.  She tosses and turns and sometimes sleeps on the recliner in the living room but that starts to bother her lower back.  Tr.

57.   Shope is able to take care of her personal grooming, e.g., showering, dressing, fixing her hair, etc.  Tr. 58.  Shope's sister does the cooking at home.  Tr. 58.  On a typical day, Shope wakes up and tries to do some exercises; she plays games or reads the news on her Kindle; she wakes her son up for school and packs his lunch; sometimes, she takes her son to school; she takes her medicine and, about 45-60 minutes after she takes her medicine, she lies down or sits in the recliner; takes about an hour and a half nap; she plays on her Kindle some more; she makes her bed; she takes a shower; and she plays on her Kindle some more.  Tr. 58-59, 66-67.  Packing her son's lunch takes about 5 minutes.  Tr. 63.  Her son's school is two blocks away.  Tr. 64. Shope takes him to school on days that he is running late.  Tr. 64.  Shope usually goes to bed around 7:00 p.m.  Tr. 59-60.  She does not socialize with friends.  Tr. 60.  Shope's husband and sister are with her during the day.  Tr. 60.  She performs some household chores, including doing dishes or loading the dishwasher and doing laundry but her son carries the laundry basket for her. Tr. 60.  She is able to go grocery shopping but, she does not go alone because she is afraid that, if she falls, she will not be able to get back up.  Tr. 60, 63.  About three days a week and, especially when she has taken her Methotrexate, she is really tired and feels really ill and doing household chores is difficult.  Tr. 62.

Shope was seeing Dr. Magrey for her mixed connective tissue disease and arthritis and she was seeing Dr. Winkleman for her neuropathy.  Tr. 50-51.  Shope starting seeing both doctors in 2012.  Tr. 50-51.  She was seeing Dr. Magrey every three months and Dr. Winkleman every six months.  Tr. 51.  Dr. Magrey referred Shope to Dr. Huang for pain management and Shope started seeing him at the beginning of 2013.  Tr. 51-52.

## 2.    Vocational Expert

Vocational Expert Mary Everts ("VE") testified at the hearing.  Tr. 69-82.  The VE described Shope's past work.  Tr. 70.  She indicated that Shope's two jobs were described in the DOT as bartender – a light, SVP 3 job and janitor – a medium, SVP 2 job.[10]  Tr. 70.  The VE indicated that Shope performed both jobs at the medium exertional level.  Tr. 70.

The ALJ then asked the VE to assume an individual the same age and with the same education and past work experience as Shope who is limited to occasionally lifting and carrying 20 pounds and frequently lifting and carrying 10 pounds; sitting, standing and walking up to 6 hours in a workday; pushing and pull as much as the lift/carry limits; occasional climbing ramps and stairs; never climbing ladders or scaffolds; frequent balancing; occasional stooping, kneeling, crouching and crawling; and no exposure to unprotected heights, moving mechanical parts, and extreme cold.  Tr. 70-71.  The VE indicated that the described individual would be unable to perform Shope's past work but there would be work in the light, unskilled category that the described individual could perform, including packer, inspector, and stock clerk.  Tr. 71-72.  The VE provided regional and national job incidence data for each of the identified jobs.  Tr. 71-72.

For her second hypothetical, the ALJ asked the VE a to assume an individual the same age and with the same education and past work experience as Shope who is limited to sedentary work, can occasionally lift and carry 10 pounds; can frequently lift and carry less than 10

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.  Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

pounds; can sit up to 6 hours in a workday; can stand up to 2 hours in a workday; and can walk up to 2 hours in a workday; can push and pull as much as the lift and carry amounts; she requires a sit stand option, meaning changing from sitting to standing or standing to sitting every 30 minutes, if needed; can occasionally climb ramps and stairs; can never climb ladders and scaffolds; can frequently balance; can occasionally stoop, kneel, crouch and crawl; and cannot have exposure to unprotected heights, moving mechanical parts, and extreme cold. Tr. 72-73. The VE indicated that the described individual could not perform Shope's past work but could perform other work in the sedentary, unskilled category, including packer, inspector, and information clerk. Tr. 73. The VE provided regional and national job incidence data for each of the identified jobs. Tr. 73.

The ALJ then asked the VE a third hypothetical, asking the VE to assume an individual the same age and with the same education and past work experience as Shope who is limited as set forth in the second hypothetical with additional limitations; namely, can occasionally reach in all directions bilaterally; can occasionally handle bilaterally; and can occasionally finger bilaterally. Tr. 74. The VE indicated that the described individual could perform work in the sedentary, unskilled category, including credit clerk and surveillance system monitor. Tr. 74. The VE provided regional and national job incidence data for each of the identified jobs. Tr. 74.

Shope's counsel asked the VE whether the individual described in the second hypothetical would be able to perform the jobs identified in response to the second hypothetical if the described individual was also limited to lifting and carrying 5 pounds or less occasionally. Tr. 75. The VE indicated that the information clerk job would still be able to be performed but the packer and inspector jobs would not. Tr. 75. Shope's counsel also asked the VE whether missing three days of work per month for medical reasons would affect an individual's ability to

sustain work. Tr. 76. The VE indicated that such a limitation would be problematic and would likely result in termination. Tr. 76. Also, in response to questioning by Shope's counsel, the VE indicated that being limited to working six hours over the course of a day would be considered less than competitive employment. Tr. 76.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

impairment,[12] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her March 27, 2015, decision, the ALJ made the following findings:[13]

1.      Shope meets the insured status requirements through December 31, 2017. Tr. 16.

2.      Shope has not engaged in substantial gainful activity since March 3, 2013, the alleged onset date. Tr. 16.

3.      Shope has the following severe impairments: small fiber neuropathy, degenerative disc disease of the cervical and lumbar spine, rotator cuff tendonitis of the right shoulder, osteoarthritis of the knee, obesity, and fibromyalgia. Tr. 16. Shope has the following non-severe impairments: mixed connective tissue disease with inflammatory arthritis (aka discoid lupus) (in remission) and adjustment disorder and depressed mood. Tr. 17-18.

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[13] The ALJ's findings are summarized.

4.      Shope does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 18-25.

5.      Shope has the RFC to perform a reduced range of sedentary work with additional limitations.  She can lift, carry, push and pull 10 pounds occasionally and less than 10 pounds frequently.  She can sit for six hours in an eight-hour workday.  She can stand for up to two hours in an eight-hour workday.  She can walk for up to two hours in an eight-hour workday.  She requires an alternating sit/stand option, which enables her to changes positions if needed every 30 minutes.  She can occasionally climb ramps and stairs.  She can never climb ladders, ropes, or scaffolds.  She can frequently balance.  She can occasionally stoop, kneel, crouch, and crawl.  She can never be exposed to unprotected heights.  She can never be exposed to moving mechanical parts.  She can never be exposed to extreme cold.  Tr. 25-28.

6.      Shope is unable to perform any past relevant work.  Tr. 27.

7.      Shope was born in 1968 and was 44 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  Shope subsequently changed age category to a younger individual age 45-49.  Tr. 27.

8.      Shope has at least a high school education and is able to communicate in English.  Tr. 28.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 29.

10.     Considering Shope's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Shope can perform, including packer, inspector, and information clerk.  Tr. 29-30.

Based on the foregoing, the ALJ determined that Shope was not under a disability from

March 3, 2013, through the date of the decision.  Tr. 30.

### V. Parties' Arguments

Shope argues that the ALJ erred in weighing the December 4, 2014, opinion of her

treating pain management doctor Shu Que Huang, M.D.  Doc. 16, pp. 14-18, Doc. 20, pp. 1-4.

Shope also argues that the ALJ erred in assessing her credibility.  Doc. 16, pp. 18-21, Doc. 20, pp. 4-5.

In response, the Commissioner argues that the ALJ properly weighed Dr. Huang's opinion (Doc. 19, pp. 7-10) and the ALJ's assessment of the credibility of Shope's subjective complaints is supported by substantial evidence (Doc. 19, pp. 10-12).

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**B.     The ALJ did not err in weighing the opinion of Dr. Huang**

Shope challenges the ALJ's decision to assign very limited weight to Dr. Huang's December 4, 2014, opinion, arguing that the ALJ failed to adhere to the "treating physician rule" and failed to consider the record as a whole when weighing Dr. Huang's opinion.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).   If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  However, an ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment

relationship with the claimant.  20 C.F.R. § 404.1527(a)(2).  The Commissioner will generally

consider there to be an "ongoing treatment relationship" when the medical evidence establishes

that a claimant is or has been seen with a frequency consistent with accepted medical practice for

the type of treatment or evaluation required for a claimant's medical condition.  *Id.*   "The

treating physician doctrine is based on the assumption that a medical professional who has dealt

with a claimant and his maladies over a long period of time will have a deeper insight into the

medical condition of the claimant than will a person who has examined a claimant but once[.]"

*Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 506 (6th Cir. 2006) (quoting *Barker v.

Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  In those instances where a physician is not a treating

source, *Wilson* has been found to be inapplicable.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d

873, 876 (6th Cir. 2007); *see also Kornecky*, 167 Fed. Appx. at 507; *see also Daniels v. Comm'r

of Soc. Sec.*, 152 Fed. Appx. 485, 490 (6th Cir. 2005) (even where ALJ referred to a doctor as a

treating source, where there was no ongoing treatment relationship, the "treating physician rule"

is not implicated).

Here, although the ALJ referred to Dr. Huang as a "treating source," Dr. Huang saw

Shope on only two occasions.  Additionally, even though the ALJ left the record open for

submission of additional records, office notes from one of Shope's two visits with Dr. Huang –

the October 21, 2013, visit – were not submitted to the ALJ.[14]  Tr. 230.   The ALJ had the office

notes from Shope's December 1, 2014, visit with Dr. Huang (Tr. 668-676) but the office notes

from the October 21, 2013, visit were only submitted to the Appeals Council (Tr. 230).   Where,

as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's

---

[14] There is an October 21, 2013, Appointment Details – after visit summary in the record from the October 21, 2013, visit with Dr. Huang.  Tr. 681-683.  That record does not provide the same details regarding the office visit as are found in the records submitted to the Appeals Council.  *See* Tr. 687-693.

decision, review by the District Court is limited to the evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996)); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs*., 987 F.2d 1230, 1233 (6th Cir. 1993).

Even if the additional records had been timely submitted to the ALJ, Shope has not demonstrated that her two visits to Dr. Huang, which occurred more than a year apart from one another, establish an ongoing treatment relationship that entitles Dr. Huang's December 4, 2014, opinion to special deference under the "treating physician" rule.  Nor does she provide any authority to support a claim that the ALJ's mere reference to Dr. Huang as a "treating source" elevated Dr. Huang's opinion to that of a treating physician entitled to special deference under the "treating physician rule."  Thus, Shope's claim that the ALJ violated the "treating physician rule" when weighing Dr. Huang's opinion fails.  *See Daniels*, 152 Fed. Appx. at 490-491 (noting that, even though the ALJ casually referred to a doctor as a treating source, the ALJ's failure to specifically address that doctor's opinion was not surprising because the doctor did not meet the requirements under the regulations to be defined as a treating physician); *see also Smith*, 482 F.3d at 876 (finding that doctors who had examined the claimant on a single occasion or treated claimant on a very limited basis did not constitute the type of ongoing treatment relationship contemplated by the "treating physician rule").

Furthermore, even if Shope could establish that Dr. Huang qualified as a "treating physician" such that his opinion would be entitled to special deference under the "treating physician rule," the ALJ appropriately considered and assigned weight to Dr. Huang's December 4, 2014, opinion, stating:

> The undersigned gives very limited weight to Dr. Huang's treating source opinion from December 4, 2014 (Exh. 6F). First, Dr. Huang is the claimant's pain

management specialist and he has recommended treatment in reliance on treatment notes from Dr. Magrey and Dr. Winkelman (Exhs. 1F; 3F; 5F; 8F; 9F). As discussed in Finding #4, clinical findings from Dr. Magrey and Dr. Winkelman do not support greater sedentary limitations than those described in this decision. Nonetheless, although the undersigned finds that the claimant's use of a cane for ambulation and standing limit her to sedentary work, the claimant's response to conservative treatment modalities do not support Dr. Huang's opinion that the claimant would be unable to sustain work activity for more than 6 hours at a time even after adapting his opinion that the claimant requires positional changes in the work-related setting. Disability is an issue reserved to the Commissioner under Social Security disability Rules and Regulations (SSR 96-5p). In the claimant's case, the undersigned has relied on the impartial vocational testimony of Ms. Everts, a board-certified rehabilitation counselor, who is familiar with these Rules and Regulations and who has extensive knowledge and experience in vocational rehabilitation and job placement. Additionally, the undersigned notes that the attorney-supplied form that Dr. Huang completed limited his assessment to sedentary work considerations only, which diminish the credibility of his opinion because it excludes any consideration of exertional and nonexertional capabilities at the light or greater exertional levels.

Tr. 26-27.

Shope's claim that the ALJ failed to explain and provide good reasons for discounting Dr. Huang's is unpersuasive. As reflected above, the ALJ explained that Dr. Huang's opinion was entitled to very little weight because Dr. Huang's treatment recommendations were made in reliance upon treatment notes from Shope's other providers – Drs. Magrey and Winkelman – which, as the ALJ explained in detail in his Finding #4 analysis, did not support more restrictive sedentary limitations than as found by the ALJ. Tr. 19-25, 26-27. Supportability is a relevant factor when weighing opinion evidence. *See* 20 C.F.R. § 404.1527. Also, Shope does not challenge the ALJ's finding that the treatment records of Drs. Magrey and Winkleman do not support greater sedentary restrictions than those found by the ALJ.

Additionally, there are certain issues that are reserved to the Commissioner for determination. For example, opinions that a claimant is disabled or an opinion as to a claimant's RFC are issues ultimately reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Although

treating source opinions on issues reserved to the Commissioner may not be ignored, such opinions are never entitled to controlling weight. *See* SSR 96–5p, 1996 WL 374183, * 2-3 (July 2, 1996); *see also Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (unpublished) ("If the treating physician . . . submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – [the ALJ's] . . . decision need only explain the consideration given to the treating source's opinion." ) (internal quotations and citations omitted); *see also Grider v. Comm'r of Soc. Sec.,* 2011 WL 1114314, * 4 (S.D. Ohio Mar. 25, 2011) (recognizing that a physician's "'sedentary' assessment was a conclusion on an issue reserved to the Commissioner").   Upon consideration of the foregoing, the Court finds that the ALJ properly concluded that Dr. Huang's opinion that Shope could only perform less than 6 hours of sedentary work per day amounted to a determination reserved to the Commissioner and therefore would not be entitled to controlling weight.

Shope also contends that the ALJ did not properly weigh Dr. Huang's opinion because she did not separately discuss other functional limitations contained in Dr. Huang's opinion, such as lifting/carrying restrictions, standing/walking limitations, manipulative limitations, and absences from work.   However, for the reasons discussed below, the Court finds no reversible error.

Initially, the Court observes that, when asked whether the described limitations had lasted for at least 12 months, Dr. Huang answered "no."  Tr. 576.

Further, with respect to the lifting/carrying and one-time standing and walking limitations contained in Dr. Huang's opinion, these are exertional limitations and the ALJ sufficiently explained why she concluded that Dr. Huang's less than sedentary limitations were entitled to

very limited weight.  Also, during the hearing, the VE testified that the information clerk job would remain available to an individual described in the hypothetical that included the limitations contained in the RFC even if the individual was further limited to lifting and carrying five pounds or less occasionally and frequently.  Tr. 75.  Thus, error, if any, with the ALJ's lack of specific discussion regarding the lifting/carrying limitation contained in Dr. Huang's December 4, 2014, is harmless.

Dr. Huang's opinion that Shope would likely be absent three days per month amounts to an opinion that an individual is unable to work and therefore is an opinion on an issue reserved to the Commissioner.  Thus, the Court finds no reversible error.

With respect to the manipulative limitations, the ALJ's detailed discussion in Finding #4 regarding the medical evidence (Tr. 19-25) and his assignment of partial weight to the state agency reviewing physicians' opinions (Tr. 27) demonstrates that the ALJ indirectly attacked the supportability and consistency of Dr. Huang's functional limitations with other evidence in the record and, therefore, the ALJ's lack of specific reference to those functional limitations when discussing the weight assigned to Dr. Huang's opinion amounts to harmless error.  *See Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 440 (6th Cir. 2010) (indicating that, in *Wilson*, the Sixth Circuit "acknowledged the good reason requirement does not require conformity at all times" and "[v]iolation of the rule constitutes harmless error if the ALJ has met the goals of the procedural requirement . . . [which] [a]n ALJ may accomplish . . . by *indirectly* attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record") (emphasis in original); *see also* (*Vaughan v. Comm'r of Soc. Sec.*, 2013 WL 453275, * 11 (N.D. Ohio Jan. 7, 2013), *report and recommendation adopted*, 2013 WL 453252 (N.D. Ohio Feb. 6, 2013) (recognizing that in the Sixth Circuit, "an ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party . . . so long as his factual findings as a whole show that he implicitly resolved any conflict." (quoting *Loral Defense Systems-Akron v. N.L.R.B*, 200 F.3d 436, 453 (6th Cir. 1999)); *see also Karger v. Commissioner of Social Sec.,* 414 Fed. Appx. 739, 749 (6th Cir.2011) (recognizing that, where the necessary evidence and analysis is contained within the decision, it may be shown that an ALJ implicitly resolved conflicts based on the ALJ's factual findings as a whole).

For example, when discussing evidence pertaining to Shope's right shoulder rotator cuff tendonitis, hand-wrist pain secondary to small fiber neuropathy, and peripheral neuropathy, the ALJ found that, in August 2014, although Shope complained of morning stiffness lasting two hours and Shope exhibited pain with palpation over the area of her right shoulder, physical examination findings revealed full range of motion and normal strength. Tr. 21, 641, 644. Also, there was no evidence of joint swelling and Shope had normal musculoskeletal functioning in her elbows, wrists and hands and normal bilateral grip strength. Tr. 21, 641, 644. Additionally, as noted by the ALJ, Dr. Magrey recommended conservative treatment of physical therapy and Naproxen and Dr. Huang encouraged Shope to engage in physical activity, physical therapy, and home exercises as a primary means of pain control. Tr. 21, 644, 672.

Also, when further discussing the chronic effects of Shope's small fiber neuropathy, the ALJ noted that the EMG/nerve conduction study findings showed no evidence of "electrodiagnostic evidence of bilateral carpal tunnel syndrome or right cervical radiculopathy[,]" "no evidence of electrodiagnostic evidence of right lumbar spine radiculopathy or peripheral neuropathy in bilateral lower extremities[,]" and "no electrodiagnostic evidence of peripheral polyneuropathy[.]" Tr. 23, 670. Also, the ALJ found that there were no longitudinal signs of involuntary movements or tremors that made it difficult for Shope to walk or use her hands and

neurological and musculoskeletal findings had been generally normal except for some tenderness with palpation. Tr. 23. Additionally, as reflected in the decision, the ALJ assigned partial weight to the state agency reviewing physicians' opinions, neither of which contained manipulative limitations. Tr. 27, 92, 106.

Also, error, if any, with respect to the ALJ's lack of specific discussion of the fingering, handling and reaching limitations in Dr. Huang's opinion is harmless because the VE testified that two jobs, i.e., credit clerk and surveillance system monitor, would be available to an individual described in the hypothetical that included the limitations contained in the RFC with the additional limitations of occasional reaching, handling and fingering on both the left and right side. Tr. 74.

Based on the foregoing, the Court concludes that the ALJ did not err in weighing and explaining the weight assigned to the opinion of Dr. Huang.

**C.      The ALJ did not err in assessing Shope's credibility**

Shope contends that the ALJ's credibility assessment is flawed because the ALJ overstated her activities of daily living and did not consider the side effects of medication.

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the

location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").[15] "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

The ALJ explained her assessment of Shope's credibility stating:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

Physically, in addition to the assessment in Finding #4, the claimant's conservative treatment recommendations, including, in particular, physical exercise, partially diminish the credibility of her allegations to the extent described in the physical residual functional capacity assessment in this finding.

As discussed in Finding #4, the claimant's treating specialists Dr. Magrey, Dr. Winkelman, and Dr. Huang have all recommended some form of physical therapy and home exercises as her primary source of treatment, which suggests increased mobility will improve her physical functioning (Exhs. 1F; 2F; 3F; 5F; 8F; 9F). Based on the longitudinal evidence as a whole, the undersigned finds that the documented effects of the claimant's severe physical impairments establish a residual functional capacity consistent with a reduced range of sedentary work-

---

[15] SSR 16-3p, with an effective date of March 28, 2016, supersedes SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

related limitations described in this finding, which is more restrictive physical limitations than the State Agency medical consultants opined (Exhs. 5F; 8F; Exhs. 1A; 3A).

The undersigned gives some weight to a statement from the claimant's employer at the American Legion to the extent that it supports the claimant's allegations that she would be unable to perform her work as a bartender at the medium exertional level and her work as a cleaner/janitor at the light exertional level, which is consistent with Ms. Everts's impartial vocational expert testimony that is discussed in Finding 6 (Exh. 2D, p. 1; see Exh. 9B; SSR 06-3p; 00-4p).

Additionally, as discussed, the claimant's activities of daily living further diminish the credibility of her allegations. Based on the claimant's statements to Dr. Smith, she is primarily responsible for preparing her teenage son for school and, after her husband leaves for work around 9 a.m., she is at home by herself despite her allegedly disabling pain symptoms (Exh. 4F).

Accordingly, the undersigned finds that the conservative treatment modalities have objectively succeeded in improving her pain and functional limitations to the extent that she has retained the capacity to perform a reduced range of sedentary work to the extent described in this finding.

Tr. 26.

Shope acknowledges that daily activities are a proper factor to be considered when assessing pain and other symptoms but contends that the ALJ overstated her daily activities and, therefore, the ALJ's credibility assessment is flawed. Doc. 16, pp. 19-20. However, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Furthermore, the ALJ did not rely solely on Shope's daily activities to conclude that her subjective statements regarding the limiting effects of her symptoms were not entirely credible. For example, the ALJ considered Shope's conservative treatment recommendations when assessing the credibility of Shope's subjective statements regarding the extent of her limitations. Tr. 26.

With respect to Shope's claim that the ALJ's credibility assessment is flawed because the ALJ did not consider side effects of her medications, an ALJ is not required to discuss every

piece of evidence.  *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004); *see also Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).   Additionally, the evidence relied upon by Shope regarding her side effects is her <u>own</u> subjective statements and her <u>own</u> report to a psychological consultative examiner regarding what she and her doctor concluded was a reason for her being in bed all day.  Doc. 16, p. 20; Doc. 20, p. 4.

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Shope's impairments is sufficiently explained and supported by substantial evidence.  Accordingly, reversal and remand is not warranted based on the ALJ's credibility assessment.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: July 10, 2017

_____
Kathleen B. Burke
United States Magistrate Judge